UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBBY LEE ROBINSON,<br><br>Defendant. | CASE NO. 2:22-cr-00212-TL<br><br>ORDER ON MOTION *IN LIMINE* ON DNA EXPERT TESTIMONY |

This matter is before the Court on the Government's Motion *in Limine* on DNA Expert Testimony (Dkt. No. 72). Having reviewed Mr. Robinson's response (Dkt. No. 89) and the relevant record, the Court GRANTS the motion.

## I.    BACKGROUND

Mr. Robinson is charged by superseding indictment with one count of Unlawful Possession of Firearms and Ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Dkt. No. 60 (second superseding indictment). In advance of trial, the Government filed various motions, including the instant motion *in limine*. Dkt. No. 72. Mr. Robinson opposes. Dkt. No. 89.

## II.    LEGAL STANDARD

"A motion in limine is a procedural mechanism to limit in advance [of trial] testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation omitted). In ruling on motions *in limine*, the Court is generally guided by Federal Rules of Evidence ("FRE") 401, 402, and 403. *See* Fed. R. Evid. 401 (defining relevant evidence); *id.* 402 (relevant evidence is generally admissible); *id.* 403 (relevant evidence may be excluded if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). While the FRE do not explicitly permit motions *in limine*, they are a part of a "district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). A motion *in limine* is ordinarily granted only if the evidence at issue is inadmissible on all potential grounds; if not, the evidentiary ruling is better deferred until trial, to allow for questions of foundation, relevancy, and prejudice to be resolved with the appropriate context. *See United States v. Sims*, 550 F. Supp. 3d 907, 912 (D. Nev. 2021). A motion *in limine* should not be used to resolve factual disputes or weigh evidence. *Id.*; *Liu v. State Farm Mut. Auto. Ins. Co.*, No. C18-1862, 2021 WL 717540, at *1 (W.D. Wash. Feb. 24, 2021).

A court's ruling on a pre-trial motion *in limine* is preliminary and can be revisited at trial based on the facts and evidence as they are actually presented. *See, e.g.*, *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."). "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce*, 469 U.S. at 41–42; *see also City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017) (district court may change its *in limine* ruling at trial if testimony brings unanticipated facts to the court's attention).

Subject to these principles, the Court issues this ruling for the guidance of the Parties.

### III.   DISCUSSION

The Government seeks an order finding that the testimony of Forensic Examiner Lara Adams of the Federal Bureau of Investigation ("FBI") is sufficient under the Confrontation Clause of the Sixth Amendment to admit into evidence a DNA analysis report. *See* Dkt. No. 72 at 1–2. A team of three Biologists (*i.e.*, Candi Alvarado, Stacy Campbell, and Patricia Kramer) processed the DNA samples in this matter. *See id.* at 2–7 (describing the process).

The Government argues that the Confrontation Clause only requires the testimony of the Forensic Examiner, not the additional testimony of the three Biologists, because it is the Forensic Examiner's conclusions that are "accusatory" and "link the defendant to the DNA at issue." *Id.* at 13. Mr. Robinson argues that such testimony alone would violate the Confrontation Clause, because the Biologists made testimonial statements that were relied upon by the Forensic Examiner in reaching her conclusions. *See* Dkt. No. 89 at 2.

### A.   Factual Background

As part of its investigation of this matter, the Government collected swabs from the firearms, ammunition, and spent shell casings found in the car Mr. Robinson was driving during the alleged incident. Dkt. No. 72 at 2. A buccal swab was also collected from Mr. Robinson for DNA comparison with the swabs collected from the physical evidence. *Id.* All swabs were sent to the FBI Laboratory in Quantico, Virginia, and received by the DNA Casework Unit. *Id.*

Generally, when evidence is received, Forensic Examiners determine "the items that will be tested," as well as "which examinations will be performed" and "the appropriate work flow for such examinations." *Id.* A team of Biologists "process the evidence in accordance with the directions of the Forensic Examiner assigned to the case" and standard operating protocols. *Id.* The Biologists "work closely" with the Forensic Examiner during the process. "When testing is

completed, the Forensic Examiner is responsible for data analysis, interpretation, and release of a report detailing his/her results and conclusions." *Id.* at 2–3.

First, working with one piece of evidence at a time, Biologist Alvarado collected "cuttings" from each swab and placed each cutting in a separate tube for processing. *Id.* at 3. The tubes are labeled with a unique barcode generated from the Laboratory Information Management System ("LIMS"). *Id.* Next, the Forensic Examiner "determined the specifications for the extraction process," which was performed by Alvarado using standard operating protocols and a robot. *Id.* A control sample was added at this stage. *Id.*

Biologist Kramer continued the process by "concentrating" DNA extracts using a centrifuge and standard operating protocols. *Id.* at 4. A possible result of running the centrifuge for an improper amount of time or at an improper temperature would be the inability to produce a DNA profile. *Id.* A DNA profile was produced in this case. *Id.* Kramer also carried out the "quantitation" step of the process, which utilizes a liquid-handling robot that moves sample DNA extract from tubes to a quantitation tray. *Id.* at 4. The liquid-handling robot has a feature to detect and correct any misaligned tubes, and the control sample is also present during this test. *Id.* at 5. Kramer then moved the quantitation tray from the liquid-handling robot to the instrument that performs the quantitation test. *Id.* The estimated amount of DNA provided for each sample was "examined" and "utilized" by the Forensic Examiner to determine how much DNA extract was needed for the next stage. *Id.* at 5. After examining that data, the Forensic Examiner entered the desired type of amplification in the LIMS system. *Id.*

Biologist Campbell then prepared the samples for "amplification," using a robot and following standard operating protocols as well as prompts from the LIMS system. *Id.* The robot that prepares the amplification sample tray is equipped with a feature to detect and correct any misaligned tubes. *Id.* at 6. The control sample was present during this test. *Id.* The amplification

1    tray was then placed on the thermocycle instrument. *Id.* During this process, Campbell used a

2    thermocycle instrument "based on designation by the Forensic Examiner." *Id.* at 6. Use of the

3    wrong thermocycler "could produce incorrect data which would be observed on review by the

4    Forensic Examiner." *Id.*

5          Finally, Campbell carried out the stage of "separation," by which the amplified DNA is

6    separated by size in order to visualize the DNA profile in a way conducive to data interpretation.

7    *Id.* Using a robot and standard operating protocols, Campbell prepared the samples for

8    separation. *Id.* at 6–7. Campbell then used a thermocycler to denature the DNA and a genetic

9    analyzer to separate the DNA. *Id.* at 7. Following standard operating protocols and prompts from

10   the LIMS system, Campbell conducted the separation process, removed the sample tray from the

11   genetic analyzer, and "uploaded the raw data by the instrument to the LIMS system to be

12   examined by the Forensic Examiner." *Id.*

13         At that point, Forensic Examiner Adams "imported the raw data" to a software program

14   and "performed her analysis" of the DNA. *Id.* She "reviewed the laboratory notes and data

15   created by each of the Biologists and agreed that all procedures had been completed

16   appropriately." *Id.* She then "analyzed all resulting data" and confirmed that the controls

17   "produced the expected results." *Id.*

18   **B.    Legal Standard**

19         The Sixth Amendment to the United States Constitution provides that "[i]n all criminal

20   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

21   him." Specifically, the provision guarantees a defendant's right to confront "those who bear

22   testimony" against them. *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (internal quotation

23   marks omitted). The testimony of a witness who does not appear at trial is inadmissible unless

24   the witness is "unavailable to testify" and the defendant had "a prior opportunity for cross-

examination." *Id.* at 54. Statements of a witness are "testimonial" (and thus subject to the Confrontation Clause) when their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Ohio v. Clark*, 576 U.S. 237, 244 (2015) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)); *see also Michigan v. Bryant*, 562 U.S. 344, 370 (2011) (holding that a court should determine "primary purpose" by "objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances" in which the statement occurs).

How these rules apply to forensic evidence is the subject of the instant motion.

### 1.      Supreme Court Precedent

In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court considered the Confrontation Clause in that very context. 557 U.S. 305 (2009). There, the trial court admitted into evidence three "certificates of analysis," sworn to before a notary public by state analysts, showing the results of a forensic analysis that determined a number of plastic bags seized as evidence  contained cocaine. *Id.* at 308. The Supreme Court held that these affidavits were testimonial, as they were "a solemn declaration or affirmation made for the purpose of establish or proving some fact," *id.* at 310 (quoting *Crawford*, 541 U.S. at 51), and were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" *id.* at 310–11 (quoting *Davis*, 547 U.S. at 830). Thus, the analysts were testimonial witnesses who were required to testify at trial. *Id.* at 311. However, the Supreme Court noted that "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case," or that "everyone who laid hands on the evidence must be called." *Id.* at n.1.

In *Bullcoming v. New Mexico*, the Supreme Court again took up the Confrontation Clause in a closely related situation. 564 U.S. 647 (2011). There, the trial court admitted a forensic laboratory report certifying the defendant's level of blood-alcohol concentration. *Id.* at 651. To support the admission of the report, the prosecution called not the certifying analyst but instead another analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test" of the blood sample. *Id.* at 652. The Supreme Court held that such "surrogate testimony" was insufficient and that the certifying analyst was required to testify. *Id.* It further explained that the surrogate testimony "could not convey what [the certifying analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." *Id.* at 661. Nor could such testimony "expose any lapses or lies on the certifying analyst's part." *Id.* at 661–62. In a notable concurrence, Justice Sotomayor "highlight[ed] some of the factual circumstances that this case does *not* present." *Id.* at 672 (emphasis in original). Those included "a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue," *id.*, or "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence," *id.* at 673.

Finally, in *Williams v. Illinois*, the Supreme Court took up the Confrontation Clause in the specific context of DNA evidence. 567 U.S. 50 (2012). There, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory matched a DNA profile produced by the state police lab. *Williams*, 567 U.S. at 56. In a fractured opinion, a plurality of four Justices held that the Confrontation Clause did not apply because "out-of-court statements that are related by the expert solely for the purpose of explaining the assumption on which that opinion rests are not offered for their truth." *Id.* at 58. The plurality also held, as "a

second, independent basis," that the outside laboratory's DNA profile was "very different from the sort of extrajudicial statements . . . that the Confrontation Clause was designed to reach." *Id.* It was "produced before any suspect was identified," "sought not for the purpose of obtaining evidence to be used against [the defendant]," and "not inherently inculpatory." *Id.*

Concurring in the judgment as the fifth vote for a majority, Justice Thomas held that the outside laboratory's statements "lacked the requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause." *Id.* at 103 (internal quotation marks omitted); *see also id.* at 110–17 (explaining his approach and disputing the "primary purpose" test). However, Justice Thomas agreed with "the dissent's view of the plurality's flawed analysis." *Id.* "In my view," he wrote, "there was no plausible reason for the introduction of [the outside laboratory's] statements other than to establish their truth." *Id.*; *see also id.* at 104–10 (explaining his disagreement). Justice Thomas also rejected the plurality's effort to modify the "primary purpose" test. *See id.* at 114 ("The shortcomings of the original primary purpose test pale in comparison, however, to those plaguing the reformulated version that the plurality suggests today.").

## 2.   Ninth Circuit Precedent

To the best of the Court's knowledge, the Ninth Circuit has not been presented with this issue on direct review, though it has addressed the issue indirectly on habeas review. *See Meras v. Sisto*, 676 F.3d 1184, 1190 (9th Cir. 2012) (affirming denial of habeas relief but stating that "the state court probably committed constitutional error" in light of *Melendez-Diaz* and *Bullcoming* by admitting forensic lab report under business records exception); *Flournoy v. Small*, 681 F.3d 1000, 1004–05 (9th Cir. 2012) (affirming denial of habeas relief where lab analyst testified "based on the tests and reports of other crime lab employees," and noting Justice Sotomayor's "decisive fifth vote" and concurrence in *Bullcoming*); *Gauldin v. Cate*, 672 F.

App'x 774, 775 (9th Cir. 2017) (mem.) (affirming denial of habeas relief where defendant had

opportunity to cross-examine a supervisor who signed and approved a DNA report); *Benjamin v.*

*Gipson*, F. App'x 656, 659 (9th Cir. 2016) (mem.) (affirming denial of habeas relief where "a

forensic analyst familiar with the DNA laboratory's procedures testified and was subject to

cross-examination").

The Ninth Circuit has also observed that "the [Supreme] Court did not settle how

'Confrontation Clause "testimonial statement" requirements apply to crime laboratory reports.'"

*Barba v. Montgomery*, 723 F. App'x 431, 432 (9th Cir. 2018) (mem.) (quoting *Williams*, 567

U.S. at 92 (Breyer, J., concurring); *see also Hill v. Lizarraga*, 731 F. App'x 686, 686 (9th Cir.

2018) (mem.) (observing "the confusion engendered by the Supreme Court's fractured decision

in *Williams*").

## C.     Application

The Court holds that the Confrontation Clause does not require the Government to

produce the three Biologists as witnesses because the Biologists did not make any "testimonial"

statements, express or implied, that are subject to the Confrontation Clause.

Contrary to Mr. Robinson's assertion (*see* Dkt. No. 89 at 2), and in light of the

circumstances, the Biologists did not make statements that had the "primary purpose" to

"establish or prove past events potentially relevant to later criminal prosecution." *Clark*, 576

U.S. at 244; *Bryant*, 562 U.S. at 370. Here, as noted in *Williams*, "it is likely that the sole

purpose of each technician is simply to perform his or her task in accordance with accepted

procedures." 567 U.S. at 85 (plurality). Each task, on its own, is insufficient to provide evidence

against a defendant. *See Chavis v. Delaware*, 227 A.3d 1079, 1093 (Del. 2020) ("Such

statements—*i.e.*, that they examined and manipulated the DNA swabs in a particular manner—

did not provide testimony *against* [the defendant]." (emphasis in original)), *cert. denied*, 141 S.

1    Ct. 1528 (2021). Instead, the Biologists engaged in essentially ministerial tasks when they

2    prepared the DNA samples for analysis and shared the resulting "raw data" with the Forensic

3    Examiner, who used a software program to visualize the DNA profiles and perform her analysis.

4    Dkt. No. 72 at 7; *see United States v. Summers*, 666 F.3d 192, 201 (4th Cir. 2011) (permitting

5    testimony of witness who opined on "objective raw data" generated by analysts). In other words,

6    it is the Forensic Examiner who connected all the steps in the process together, drew conclusions

7    from the data, and ultimately made testimonial statements: she "performed the final-level DNA

8    analysis, reviewed the results of the preliminary evidence processing conducted by colleagues,

9    produced the relevant DNA profiles, and expressed her expert opinion that there is very strong

10   support for [Mr. Robinson's] DNA on the firearm and magazine." Dkt. No. 72 at 12.

11            This approach is compatible with the approaches of other courts that have been directly

12   presented with the issue. *See, e.g.*, *United States v. Peshlakai*, No. CR21-1501, 2023 WL

13   4235671, at *11 (D.N.M. June 28, 2023) (permitting testimony of witness who "performed the

14   final analysis, reviewed the final laboratory notes and data, and drew the relevant conclusions");

15   *United States v. Kaszuba*, 823 F. App'x 77, 79 (3d Cir. 2020) (finding no Confrontation Clause

16   violation where witness "compiled and signed the report" and "reviewed every test the

17   technicians conducted and every procedure they used"); *see also Chavis*, 227 A.3d at 1093

18   ("Here, it cannot be said that any of the nontestifying analysts' manipulation of the samples

19   generated any results or that their entries in the case files were testimonial."); *People v. John*, 52

20   N.E.3d 1114, 1127 (N.Y. 2016) ("We conclude that an analyst who witnessed, performed or

21   supervised the generation of defendant's DNA profile, or who used his or her independent

22   analysis on the raw data . . . must be available to testify."); *State v. Lui*, 315 P.3d 493, 506

23   (Wash. 2014) ("Our test requires cross-examination, but only cross-examination of the witness

24   who gives meaning to raw data. Not every laboratory analyst is required to testify."); *State v.*

1    *Lopez*, 45 A.3d 1, 16 (R.I. 2012) (finding no Confrontation Clause violation where witness

2    "undertook the critical stage of the DNA analysis, supervised over and had personal knowledge

3    of the protocols and process of all stages involved in the DNA testing, reviewed the notes and

4    data produced by all previous analysts, and testified to the controls employed by the testing lab

5    to safeguard against the possibility of testing errors").

6          Mr. Robinson's other points are unavailing. He argues that the Forensic Examiner "has

7    no personal knowledge of what tests the three absent witnesses conducted or the results they

8    obtained." Dkt. No. 89 at 2. But as the Government's brief explains—and Mr. Robinson does not

9    seriously refute—the Forensic Examiner was directly involved in the processing of the DNA

10   samples, including "determin[ing] the items that will be tested," "which examinations will be

11   performed," and "the appropriate work flow for such examinations." Dkt. No. 72 at 2; *see also*

12   *id.* at 5 (at amplification stage, Forensic Examiner "determines[s] how much of the DNA extract

13   will be needed" and "which type of amplification will be run").

14         Mr. Robinson also argues that "if 'supervising' the process were sufficient to satisfy the

15   Six[th] Amendment," both *Melendez-Diaz* and *Bullcoming* "would have [been] decided

16   differently." Dkt. No. 89 at 2. But this matter is readily distinguishable from *Melendez-Diaz*,

17   where *no* live witness was offered; here, the Forensic Examiner will testify. *See* 557 U.S. at 308.

18   And it is readily distinguishable from *Bullcoming*, where the witness "did not sign the

19   certification or perform or observe the test reported in the certification"; here, the Forensic

20   Examiner performed the DNA analysis, authored and signed the report, and was involved in

21   processing the DNA samples. 564 U.S. at 652; *see also id.* at 672 (Sotomayor, J., concurring).

22         Of course, the question presented is of enormous importance: DNA analysis is often

23   powerful evidence. As with any forensic evidence, it relies on human input and, therefore, is not

24   immune to human error. *See Melendez-Diaz*, 557 U.S. at 318 ("Forensic evidence is not uniquely

1   immune from the risk of manipulation."); *Williams*, 567 U.S. at 137 (Kagan, J., dissenting)

2   ("Scientific testing is technical, to be sure; but it is only as reliable as the people who perform it."

3   (internal quotation marks and citation omitted)); Adam Benforado, *Unfair: The New Science of*

4   *Criminal Justice* 20 (2015) ("DNA testing—the shining jewel of the forensic world—appears to

5   be susceptible to confirmation bias."). *See generally* Erin E. Murphy, *Inside the Cell: The Dark*

6   *Side of Forensic DNA* (2015). And errors in DNA analysis can lead to grave injustice. *See, e.g.*,

7   Brief of Amicus Curiae the Innocence Network in Support of Petitioner at 6–12, *Williams*, 567

8   U.S. 50 (No. 10-8505) (detailing how "erroneous DNA analysis has resulted in wrongful

9   conviction of the innocent").

10          However, Mr. Robinson, or any other defendant, is not without recourse. As the

11   Government notes, "defendant has had an opportunity to consult an expert to review the case file

12   to locate any such issues," but "no such issues have been identified." Dkt. No. 89. Further, he

13   may cross-examine the Forensic Examiner on the basis of her conclusions—including the

14   integrity of the "raw data" that she relied on—and the jury can weigh her testimony accordingly.

15   *See Summers*, 666 F.3d at 204 ("[T]he handling of evidence, calibration of equipment, and the

16   like can be fertile ground for cross-examination . . . ."); *see also Lopez*, 45 A.3d at 16

17   ("[Q]uestions as to how prior analysts' handling or preparation of the DNA samples may have

18   affected [the expert's] independent, scientific opinions are evidentiary, and not of a constitutional

19   dimension."). While the Government is not *required* to call the Biologists as witnesses, the

20   Government proceeds with the sole testimony of the Forensic Examiner at its own risk. *Cf.*

21   *Melendez-Diaz*, 557 U.S. at 311 n.1 ("It is up to the prosecution to decide what steps in the chain

22   of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the

23   defendant objects) be introduced live.").

24

1    But on this motion, the task of the Court is not to fashion evidentiary rules out of whole

2 cloth, or to exclude a defense. The Court's task is to determine what the Confrontation Clause

3 requires. Here, it does not require the testimony of the Biologists, under the facts of this case.

### IV.    CONCLUSION

5    Accordingly, the Court GRANTS the Government's Motion *in Limine* on DNA Expert

6 Testimony (Dkt. No. 72).

7    Dated this 18th day of September 2023.



_____

Tana Lin
United States District Judge